Thank you and good morning your honors. May it please the court and counsel, can you hear me? I tend to back away from these things. My name is Tracy Staub and I am here on behalf of my client Mr. Von Krosigk. I will try and reserve five minutes for rebuttal. We'll see how that goes. As a preliminary note, I'd like to indicate to this court that Mr. Von Krosigk has made it abundantly clear that he wants to fire me. And he's done that with communications to this court and to myself as well. This court, however, has appointed our office after giving Mr. Von Krosigk several options. And I have proceeded in that manner. I will continue to work on his behalf until otherwise indicated by this court. I have presented... You can't always pick our clients. No we can't your honor. It leaves me a little vulnerable. I don't even have the support of my client up here. But I'm doing the best that I can given the circumstances. Mr. Von Krosigk was charged and ultimately convicted with 16 counts. Three counts of mail fraud and 16 counts of mailing a threatening communication. On appeal, he raises six issues. Five of them concerning the sufficiency of evidence on the mail fraud counts. And one of them concerning a jury bias or jury partiality concern relating to all of the charges. Just as a very brief factual background, both the indictment and the two-convict instruction in this case require that the government prove that Mr. Von Krosigk made up a scheme or a plan for obtaining money from the Wells' by making a false statement or a promise. In the indictment, the government alleged that the false statement concerned the validity of the trusts recommended by Mr. Von Krosigk. And specifically, the government asserted that Mr. Von Krosigk told Ted and Fay Wells that they could protect their property by putting it into a common law or business trust. When in fact, he knew that these trusts were a sham. And that was the indictment. In its response brief, the government acknowledges that, quote, no government witness testified that the trusts were sham trusts. And that was on page 25 of the government's brief. Instead, the government has switched gears and now claims that the false statement was Mr. Von Krosigk's assurance that a certain kind of trust could protect their property when he knew that that assurance was false. The first issue on sufficiency of the evidence that I would like to address is whether Mr. Von Krosigk gave bad legal advice and whether a bad legal advice can be the basis for a fraud charge. The restatement of laws which were cited in the briefs indicate that a statement of the law may be a statement of fact or a statement of opinion. A statement about the legal consequences of, yes? I think that what you have to address is not simply the legal advice but some of the actions which Mr. Von Krosigk took. After advising that the Massachusetts Business Trust would be safe and would prevent the assets from being, quote, stole from, unquote, he did one other thing. He had himself called, named trustee. That's correct. And that allowed him control over the assets in the trust. That's correct. Now, when you put those two steps together, this trust is going to be safe, and I'm trustee. The it's going to be safe is somewhat qualified. It's going to be safe from everybody but me. I understood, Your Honor. That may be the basis of the falsity. The false statement that it would be safe. The false statement was it's going to be safe from everybody. But when he had himself named as trustee, that took one person out of the everybody and one important person. It did, Your Honor, and I think that what you have to look at is that the Von or the Wells' knew, as the IRS agent testified, everything was up front. The trust documents made it clear who was in control of these trusts. There are three trustees, Ted and Faye Wells and Mr. Von Crossick. Ted was 95. His wife was 81. 87, I think. 87, I'm sorry. Yes, Your Honor. I believe, and again, I was in the family, but I believe that's the case. They were pretty old. Yes, they were, Your Honor. I understand that, and I also understand that there was evidence after the fact that they were suffering from certain forms of dementia and that, but at the time that the trust documents were created, they had not been declared incompetent, and there were mixed evidence by the banker that Mr. Wells appeared competent at the time. So it is true that Mr. Von Crossick told them this kind of trust can protect your assets, and then he became a trustee. He didn't make himself a trustee. Obviously, Ted and Faye Wells had to agree to allow him to become a trustee, and they knew what that power was. Why couldn't the jury take a look at the statement, it's going to be safed and not be stole from, with evidence that Mr. Von Crossick had in mind, one, to be named trustee, two, to get the money from Wells Fargo and put it in silver and gold, and three, to find an unnamed veteran, disabled, and give them the money outright for educational purposes. Isn't the jury entitled to say, wait a minute, that's just a little bit too convenient? And this is the part that... Why isn't that sufficient evidence? No, and I've struggled with this as well, going through my mind. I think what it comes down to, though, is that the government has to prove a false statement. And at the very essence, what you're saying is that the false statement is that this will protect your assets, when in fact it did not. Right. And again, that goes back to what the Wellses wanted. Is it likely they wanted him to be able to cart the money off for himself? Well, and truthfully, there's nothing in there that says that he did cart it off to himself. Giving it to an unknown veteran is a little questionable. But the jury could have concluded otherwise. Yes, they could. When it weighed as much as it weighed. And I understand that. It wasn't federally handed out to some veteran. I understand that. The person who received it had to have a way to move it away. A truck or something, I think, was the evidence. I acknowledge that that's a little concerning for my client. But the technical argument on this is the false statement. Is the statement false? It said that this will protect. This will protect. And it plainly didn't. Your assets. Again, I. And it couldn't have protected the assets from him if he would be the trustee. No, but the Welles' knew that. They knew that he would have control of their assets. And when you use the word protect, in what sense? Wasn't there an implied representation by Mr. Von Crossig that he wouldn't steal it? This is to protect your assets. I would think so, yes, that he would not steal the money. And I agree that if he abused his position as trustee, that he breached a fiduciary duty, or that he stole assets that he was not entitled to take, that there is a crime possibly of theft or embezzlement. But what we're talking about here is a very specific crime of mail fraud and the very specific elements within that crime. How about counts two and three on the letters that he sent to financial entities claiming the UCC1 lien was valid? That's correct. That's another argument on sufficiency of the evidence. Would you like me to address that one? Yes. Okay. Fifth issue on sufficiency of the evidence was that the two mailings, there were three mailings, three counts of mail fraud. The second and third mailings occurred in June. However, Mr. Von Crossig had been removed as trustee, and I believe that the trust had been dissolved in February. So the government's theory of the case presented in the jury instructions and throughout the trial was that this trust was the vehicle used to defraud the Wellses, and yet the trust no longer existed and Mr. Von Crossig no longer had any control. Yes, but the trust had only the silver and gold. The house was still in the names of the Wellses in a different trust. I believe at that point it had been taken out of the trust and put back into their names. All right. And he filed a UCC1 lien bogus as can be. There's no evidence that he had any basis for filing that lien. And he told the bank, I'm going to exercise the lien. Well, again, going back, the Wellses knew about the lien as well. They did. Where's the evidence of that? Your Honor, it was done in October, and I believe Mr. Von Crossig testified that he discussed it with Ted and Fay Wells as a means of providing additional protection for the property. I don't know if their signature is. The lien provided additional protection to the property? That's correct, Your Honor. Because he was filing a bogus lien, and so if somebody came along and filed a real lien he would be senior and he could protect the property for them and give the money to them. That's correct, Your Honor. And bogus in the sense that admittedly there was no value given for the lien, but known in the sense that Ted and Fay Wells knew about the lien. So, like I say, the trust was no longer in possession of any of the property. The trust had been dissolved. Mr. Von Crossig had been removed as a trustee of the trust. So the vehicle of the alleged scheme was no longer in existence. And then four months later Mr. Von Crossig sent mailings to the bank and I believe the auctioneer, but I could be wrong on that, that he had a lien on this property that was superior to the bank's lien and the auctioneer's lien. Now the mailing has to be in furtherance of the scheme, and the scheme is the use of the trust to obtain control. But if he's no longer using the trust to obtain control, then the scheme is no longer in operation. The scheme has, that particular scheme alleged in the indictment has ended. One of the other issues of sufficiency of the evidence that I addressed in my briefs was the materiality of the statement. And again, the statement, even if we assume that it was false, this trust, this kind of trust will protect your assets, assuming that it is false. The question is the government has to prove that that is a material false statement. And in this case, Mr. Von Crossig told the Welles' go talk to an attorney, and they did go talk to an attorney, and the attorney prepared the trust. Who got the attorney for them? He gave them the name. That is correct. However, there is no allegation by the government and no proof in this case that there was a conspiracy. And we cited case law in our brief that said in order for Mr. Von Crossig to be held responsible for the bad deeds of this attorney, there has to be a co-conspirator instruction. And the jury concluded the attorney was going to say whatever Von Crossig told him to say because that's how the attorney got fees and clients? No, because that would make the attorney a co-conspirator or complicit. But the failure to charge conspiracy doesn't mean that there wasn't one. No, but the failure to include a jury instruction that Mr. Von Crossig was responsible for the actions of the attorney does prevent the government from making him responsible for the attorney's actions. Did he propose such an instruction? No, he did not. Clear error? Is that what your claim is? I don't know that it would be his responsibility, Your Honor. It's the government's burden. If the government wants to argue a co-conspirator or a co-defendant theory, then I think the government has the burden of submitting this jury instruction. So again, the issue is materiality. And there's evidence, yes, that Mr. Todd had used these trusts before and that Mr. Todd knew Mr. Von Crossig. But again, the attorney, and there were two of them in this case, there was no allegation that the attorney had committed a crime or that he had committed malpractice or that he was a co-conspirator in this case. But the record shows how quickly he disappeared after he did what he did, doesn't it? Well, disappeared, I don't know. He was back helping Mr. Von Crossig with the trust after the fact, and he did testify at trial, so I don't know that he was unavailable afterwards. I agree that Mr. Von Crossig and the Wellses created documents subsequent to the creation of the trust, to manage the trust, including, well, the one attorney was present when Mr. Von Crossig became a trustee, and that was known about. So again, there's that. She had a fiduciary duty to the Wellses before Mr. Von Crossig did as a trustee. So is her involvement, Constance Wells, I think, or not Wells, Constance Norris, was her involvement and the involvement of Mr. Todd an intervening act, in a sense, that no longer made Mr. Von Crossig's statements material? I have about five minutes left, so unless there are questions from the court, I'll reserve that for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, Ms. Staub. My name is Wendy Olson. I'm an assistant United States attorney for the District of Idaho. I was child counsel below for the United States. I'd like to start my comments this morning by addressing Ms. Staub's argument that the evidence was insufficient with respect to counts two and three to prove that the mailings in those counts were in furtherance of the scheme to defraud. Count two charged a June 2, 2005 mailing by the defendant to Corbett Auction House, which was the auctioneer for the Wells property. Count three charged a June 15, 2005 mailing from the defendant to Farmers and Merchants State Bank, which had financed a loan to the conservator of the estate to get the property ready to be sold. I think in examining whether those mailings are in furtherance of the scheme to defraud, it's important to look at the entire charge about what the scheme to defraud was, what the indictment said about what the scheme to defraud was. And that was a scheme to defraud the Wells of their property, their investment account, and their real property by telling them to put the property into a trust so that he could obtain control of that property. As the evidence showed and as the introductory paragraphs of the indictment alleged, there were a number of both preliminary steps and subsequent steps, in addition to the formation of the trust, that Mr. von Kroesig took around the trust. One, of course, was to get unlimited powers of attorney from them. Another was to put these false UCC liens on the trust property in October of 2004, shortly after the trusts were formed. And those false liens purported to have his entity, another entity of his, called the Antelope Assembly, which I think the record is clear he couldn't really adequately explain what that was other than some other entity that he had that he represented to the Wells would secure their trust property. And those liens were put not just on the residence itself or a bank account itself, but on what he had told them was the trust property. That was another handle for him to get his grips on that property. And in June of 2005, when he sent the mailings that were the subjects of Counts 2 and Counts 3, as to Count 2, he specifically referenced trust property. He was telling the auction house, look, you're going to try to sell what is this trust property. I've got to lean on it. It's an additional effort by him to further that scheme to try to get control of that property. He's still claiming it's trust property. In fact, he told his associate, Myrtle Baldwin, that's in the record. I can't remember if it's supplemental excerpts of record 82 and 83 or excerpts of record 82 and 83. But he testified that he was sending that mailing on behalf of the trust. He still viewed himself as a trustee. As to the June 15th letter to Farmers and Merchants State Bank, he attached to that the UCC documents. The documents purported to place a lien on the trust property. Ms. Staab pointed out that the trust had been dissolved at some point along the way so that the scheme alleged in the indictment had indeed ended by the time the UCC liens were claimed by mailings to be valid. Well, Your Honor, I think that the problem with that argument is that it doesn't include all of what is charged in the indictment. He is charged with executing a scheme to try to get the property by telling them to put their property into the trust. So he could gain control of it. And that involved not only putting the property into the trust, but these ancillary acts as well. And although the court had removed Mr. Once the lien had been put on the trust property, even when the trust was dissolved, the lien followed that property. Well, he is trying to make this claim, yes, that this is still trust property. I am still the trustee. This is still trust property. And I am the one who has control of this property. He is still trying to get control of the object of his scheme, the real property. He's already got the stuff in the Wells Fargo investment account. So it is not merely a scheme to get them to put their property into trust. Have you ever found out where the gold and silver family went? No, Your Honor, we have not. Have you ever found the disabled veteran? No, Your Honor. No disabled veteran was able to be located matching that description when the FBI and the other investigative agencies looked into it, nor the 700 pounds of gold and silver that would have had to have been hauled away from that particular business. Your Honor, so I would submit that because there is still a thought by the defendant that this is trust property, he's taken his actions to put them in trust. He's still trying to get that property. These mailings are in furtherance of his scheme to defraud the Wells of that property. I'd like to next turn my attention to the argument as to the sufficiency of the evidence on the materiality element of the claim. As the Court is well aware, as both parties agree, a false statement is material if it has a natural tendency to influence the decision-maker. In this case, that decision-maker is the Wells. And I would submit that there was that tendency to influence them. They put their property into the very trust instrument that the defendant recommended. Now, much has been made on appeal and sort of been narrowed down into this role of the lawyer, Mr. Todd. But I would submit when you look at the full record, that all of the evidence of Mr. von Kroessig's involvement with precisely this kind of what they call a trust instrument, this Massachusetts Business Trust or a common law trust, these were his trusts. There was evidence introduced into the record of at least two other trusts that he had been involved in. One was called the Holston-Friesian Trust, which is included at the back end of the supplemental excerpts of record. Another trust that he referred to where he had helped a rancher put some property, including some sheep, into a trust. And he admitted prior to the trial, the criminal trial and the deposition, the guardianship proceedings, that the trust that the Wells put their property into the trust, there were actually two of them, where the terms were identical to the trust that he had had the rancher or the sheep guy put his property into. And when you compare the terms of the trust at issue, the trust at issue in this case, the Wells' trust, to that Holston-Friesian trust that was at the back end of the government's supplemental excerpts of record, the terms of those are identical. Mr. von Kroessig was a trustee of all of those trusts. These are his trusts he was representing to the Wells. Do this. He knew about them. Mr. Todd is a figure he brought in. I think when you look at Ted and – What has happened with Mr. Todd or with – Ms. Norris? Has anything happened with them? They have not been charged criminally. That's a two-year piece, isn't it, to suggest that they're not – the fact that they're not charged doesn't mean that they're not guilty, that there wasn't a conspiracy. But the fact that they're not somehow acted against, does that bolster the defendant's argument that their intervention or their involvement is, in fact, an intervening cause that cuts the chain between the defendant and Mr. Todd? I don't think it bolsters their argument, Your Honor, that it was an intervening cause, because I don't think that's what the evidence has shown. These are people brought into the mix by Mr. von Kroessig. Could they have been charged? I think that Mr. Todd indicated in his testimony that he had talked to bar counsel and was very limited in answering any of the questions. He was called as a defense witness. The government was able to call Ms. Norris in a very limited fashion to authenticate signatures. There's this Martel Baldwin who plays a piece in all of this, who got her uncle involved in a similar situation and who was called by the defendant to talk about that trust. I think to try to bolster his claim that this was not a false statement, that this would protect the assets, that these kind of trusts do protect assets. Ms. Baldwin was not charged. She was not seen by the government until the time of the trial. And so these are individuals I would submit the evidence shows the defendant brought into the mix along the line. They're not intervening factors. I think the inference that the jury drew, and which is an appropriate inference, is that this is Mr. von Kroessig's deal, and he brought these people in to lend some credence to what he was trying to do with the Wells. Ted and Fay Wells, I would submit, in contrast to other people who may be involved with these kinds of trusts, who may not want the government to get access to their assets, who may be concerned about tax. I think Ms. Farrell testified that this was a kind of a trust that, although not in this case, was typically used as an abusive trust in tax types of cases, that Ted and Fay Wells, who had a prior will, and their lawyer, Jim Kaiser, testified at the trial. He was a recipient of one of the threatening letters. They were expecting to see somebody. They knew about lawyers. They were expecting to see a lawyer. And so Mr. von Kroessig brought in this Mr. Todd to make it look like a more legitimate kind of deal. And he came in. Mr. von Kroessig, as I think the record is clear from the excerpts of Mr. Todd's testimony, which are approximately excerpts of records 180 to 190, Mr. von Kroessig is there throughout. He's in and out. Even if he's not sitting down for the conversation, his presence is there throughout. I think the evidence at trial was clear, and it's clear from the record, that from the time Ms. Baldwin introduced Mr. von Kroessig to the Wells in the summer of 2004 to the time the Guardian was able to remove the Wellses from their home in early January of 2005, they were under the thumb of Robert von Kroessig. They did what he influenced them to do. They made financial arrangements based on his recommendations. They rented a portion of their property to Norm Seid, an associate at the time of Mr. von Kroessig. They had Mr. von Kroessig testify that he had an individual, a pharmacist named Bruce Reeder, bring their medicines to them. He was present when the court visitor came out, when the Guardian ad litem came out to make an initial assessment whether a guardianship and a conservatorship were necessary. He told those individuals, and they testified at trial, that he told them that, look, I've got their property in a trust. He told the court visitor, Ms. Buchert, you're not going to like some of the things that you see. He was in control of their operations. Mr. von Kroessig was in control of the Wellses' operations from July of 2004 to early January of 2005. Mr. Todd was not an intervening actor. He was someone brought in along the way so that Mr. von Kroessig could accomplish his objectives in gaining access to their property. Your Honor, I'd like to conclude my remarks this morning by making a comment about the initial argument that Mr. von Kroessig makes on appeal, that he was charged with giving legal advice, that the mail fraud statute doesn't allow the government to prosecute him for providing legal advice unless he is in some close relationship with them. It's the government's position that that is not really a sufficiency, at first place, not a sufficiency of the evidence argument, that it is an application of the mail fraud statute to this conduct argument that was not raised below. That should be reviewed for plain error by this court. And when you look at it for plain error, it suggests there's no error because, in fact, that's not what he was charged with doing. It's a myth that there was a leap of logic from simply looking at the language in the indictment that he made a false representation about a trust and then saying, oh, that has to be, he's being charged with giving bad legal advice. I don't think it's automatically legal advice when there is a statement made about an entity with legal applications. I think the evidence was clear and the indictment was clear that these were the kinds of trust documents that this defendant knew a lot about, that he made a factual representation, and that's what the evidence at trial bore out as well. I understand Ms. Staub's point that that may be a question of degree because it also can be when you look at the element of did he make a false statement. There's no false statement if, in fact, he was giving legal advice. I would submit to you that the evidence has shown that he was not giving legal advice. He was making a false statement. That was the evidence that was presented by the government. Those were the arguments that both sides really made below. And the jury, the defendant did testify that he brought in a lawyer, go see a lawyer, and the jury was free to reject that advice. They were the ones making the credibility determination, and so the evidence was sufficient to prove that he made a false statement, that this trust entity would work to protect their property. Lastly, Your Honors, Ms. Staub has indicated on appeal that the government's allegation or the sufficiency of the evidence that this was a false statement must fail because there was not evidence that anyone testified that the trust documents or the trust themselves were shams. And while that precise language was not used, I would submit that the evidence showed that these were sham trust instruments, that they did not work to protect their property. They didn't work for their purpose. Pardon? They sure didn't work for the purpose understood by the Wells. Correct. Right. And he got the – I think Your Honor addressed this first question to Ms. Staub. That's precisely the best evidence is that he got the $117,000, and we frankly don't know where it is now, although I suppose someone does. A disabled veteran got the assets, whoever he might be. Thank you, Your Honors. Thank you. Rebuttal? Thank you, Your Honors. I think that what's important to remember, and the government argues that this was a sham, is that the Wells' went into this with their eyes open. They had two attorneys representing them. The IRS agent indicated that it was very easy to tell from these documents who was in control of the assets. They knew that Mr. Von Crossek was obtaining a lien against the trust property, and so everything was up front and clear. And the district court indicated during the trial that people can enter into contracts, and you don't have to call them trusts. I can enter into a contract where I give you all kinds of discretion, and that is just the nature of the contract. It may not be a Massachusetts business trust. It may not be a statutory trust. But if we both go into it with our eyes wide open, we can enter into that kind of a contract. So your bottom line is that we should reverse. Nothing's been done wrong here. Everything is only up and up. I'm not saying that, Your Honor. And I have questions and concerns about the $117,000, just like you do. However, again, if that was a misuse of his power, there is another crime to be charged. But the government can't claim that he deceived them about the power he would have because that was up front. Even about the power he would have, he deceived them as a charge, about the effect that the document would have to stop their assets from being, quote, stole, unquote. Right. And the jury found that was a false statement because that document, plus the power of attorney, plus being named trustee, plus the acts showed that at all times he had intended to steal their property himself. Maybe the jury didn't believe anything about the disabled veteran. Maybe they didn't. Maybe they didn't. And they were entitled to disbelieve that. But understand that the Wells's wanted their money to go to an educational purpose, and they may not have wanted this purpose. I understand that. Who said that? Their original wills that were in place indicated that the grandchildren would get a small amount of the property and everything else would go to educational purposes. So this may not have been how you and I would control our estate, but that's not to say that this is not what the Wells's wanted. And, again, the bottom line is that when these were created, the Wells's will was after they were dead, the money should go to educational purposes, not their grandchildren. That's correct. It didn't say very much about how it should be used while they were still alive. I know, Your Honor. And like I say, I always go back to he may have embezzled the money or stolen the money, but he's charged here with defrauding the Wells's. And the bottom line is that the Wells's knew he was in control of their assets when they signed those documents. There was no deception here. And they had two attorneys to ask questions to and advise them on what kind of protection this trust would give. The attorneys were not bobbleheads. They had a duty of fiduciary, and they had a duty to advise the clients. Thank you, Your Honor. Thank you very much. Thank you. I thank both counsel for another well-argued case. The case is submitted for decision.
judges: Farris, Clifton, Bea